IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MIRANDA MAE O'MARY,

       Plaintiff,

v.                                              CIV 16-0245 KBM

NANCY A. BERRYHILL,[1]
Acting Commissioner of Social Security,

       Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Plaintiff's Motion to Reverse and

Remand for Rehearing, with Supporting Memorandum (*Doc. 21*), filed November 16,

2016. Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73(b), the

parties have consented to me serving as the presiding judge and entering final

judgment. *Doc. 9*. Having reviewed the parties' submissions, the applicable law, and the

relevant portions of the Administrative Record, the Court will deny the Motion.

**I.    Procedural History**

This is Plaintiff's second appeal. On June 29, 2011, Plaintiff protectively filed an

application with the Social Security Administration for disability insurance benefits under

Title II of the Social Security Act. *AR* at 148-49.[2] Plaintiff alleged a disability onset date

of October 20, 2007, due to "Fibromyalgia, Arthritis, and Compressed Dics (sic) in

---

[1] Effective January 20, 2017, Nancy A Berryhill became the Acting Commissioner of the Social
Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy
A. Berryhill is therefore substituted for former Acting Commissioner Carolyn W. Colvin as the
defendant in this suit.

[2] Documents 12-1 through 12-29 comprise the sealed Administrative Record ("*AR*"). The Court
cites the Record's internal pagination, rather than the CM/ECF document number and page.

neck." *AR* at 148, 173. However, Plaintiff continued to work full time until February 18, 2011. *AR* at 173.

The agency denied Plaintiff's claims initially and upon reconsideration. *AR* at 74-83. Plaintiff requested review and, after holding a *de novo* hearing, Administrative Law Judge Myriam C. Fernandez Rice ("the ALJ") issued an unfavorable decision on May 3, 2013. *AR* at 42-50. The Appeals Council denied Plaintiff's request for review of the ALJ's decision on November 12, 2013. *AR* at 1-6. As such, the ALJ's decision became the final decision of the Commissioner. *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

Plaintiff then appealed the ALJ's decision to this Court. *AR* at 491-94. The Acting Commissioner of Social Security requested voluntary remand of the case pursuant to sentence four of 42 U.S.C. § 405(g), *see AR* at 497-98, and the case was accordingly remanded. *AR* at 495-96. On remand, the Appeals Council instructed the ALJ to review new and material evidence submitted by Plaintiff (specifically mentioning a consultative examination conducted by John Vigil, M.D.) and to weigh a fibromyalgia questionnaire submitted by Kathy Finch, M.D., one of Plaintiff's treating providers. *AR* at 502-03.

Purporting to do just that, the ALJ held a second *de novo* hearing and, ultimately, issued another unfavorable decision on December 8, 2015. *AR* at 424-37. The Appeals Council did not assume jurisdiction over the case, and so the ALJ's second decision became the final decision of the Commissioner. 20 C.F.R. § 404.984. This Court now has jurisdiction to review that decision pursuant to 42 U.S.C. § 405(g) and 20 C.F.R. § 422.210(a).

A claimant seeking disability benefits must establish that she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a). The Commissioner must use a five-step sequential evaluation process to determine eligibility for benefits. 20 C.F.R. § 404.1520(a)(4).[3]

At Step One of the process, the ALJ found that Plaintiff engaged in substantial gainful activity from October 20, 2007 through February 18, 2011, but that she had not engaged in substantial gainful activity since that time. *AR* at 426. However, the ALJ did note that Plaintiff continues to work for six hours per week and that "[a]lthough this work does not rise to the level of substantial gainful activity, it does illustrate her ability to find and maintain some employment." *AR* at 427. At Step Two, she determined that Plaintiff suffers from the severe impairments of "cervical spondylosis, fibromyalgia, osteoarthritis, chronic pain, depression, anxiety, and obesity." *AR* at 427. At Step Three, the ALJ concluded that Plaintiff's impairments, individually and in combination, did not meet or medically equal the regulatory "listings." *AR* at 427-30.

---

[3] The Tenth Circuit recently summarized these steps in *Allman v. Colvin*, 813 F.3d 1326, 1333 n.1 (10th Cir. 2016):

> At step one, the ALJ must determine whether a claimant presently is engaged in a substantially gainful activity. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). If not, the ALJ then decides whether the claimant has a medically severe impairment at step two. *Id.* If so, at step three, the ALJ determines whether the impairment is "equivalent to a condition 'listed in the appendix of the relevant disability regulation.'" *Id.* (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004)). Absent a match in the listings, the ALJ must decide at step four whether the claimant's impairment prevents him from performing his past relevant work. *Id.* Even if so, the ALJ must determine at step five whether the claimant has the RFC to "perform other work in the national economy." *Id.*

When a claimant does not meet a listed impairment, the ALJ must determine her residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(e). RFC is a multidimensional description of the work-related abilities a plaintiff retains in spite of his medical impairments. 20 C.F.R. § 404.1545(a)(1). "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." SSR 96-8P, 1996 WL 374184, at *1 (emphasis in original). In this case, the ALJ determined that Plaintiff retains the RFC to "perform light work as defined in 20 C.F.R. § 404.1567(b) except that she cannot climb ladders, ropes, or scaffolds and is limited to occasional overhead reaching. She is able to maintain, understand, and remember simple work instructions with occasional changes in work setting." *AR* at 430.

Employing this RFC at Steps Four and Five, the ALJ determined that Plaintiff is unable to perform her past relevant work as a court clerk. *AR* at 435. Relying upon the testimony of a vocational expert ("VE"), however, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform despite her limitations. *AR* at 436. Specifically, the ALJ determined that Plaintiff maintains the RFC to work as an electronics worker, press operator, or fruit distributer. *AR* at 436. Thus, the ALJ determined that Plaintiff is not disabled and denied benefits. *AR* at 437.

## II.    Legal Standard

This Court "review[s] the Commissioner's decision to determine whether the factual findings are supported by substantial evidence and whether the correct legal standards were applied." *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015) (quoting *Mays v. Colvin*, 739 F.3d 569, 571 (10th Cir. 2014)). A deficiency in either area is grounds for remand. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012). In

making this determination, however, this Court "cannot reweigh the evidence or substitute [its] judgment for the administrative law judge's." *Smith v. Colvin*, 821 F.3d 1264, 1266 (10th Cir. 2016) (citation omitted).

## III.    Analysis

Plaintiff argues that the ALJ improperly rejected the opinions of her treating physician, Kathy Finch, M.D., other treating sources Nancy Stockton, PA-C, Debra Jaccard, CNP, and Marissa Romero, CFNP, and consultative examiner John Vigil, M.D. *See Doc.* 21 at 1. Plaintiff also contends that the ALJ's Step Five finding is not supported by substantial evidence because the VE testimony as to the number of jobs in the national economy is unreliable. *Id.* The Court addresses each argument in turn.

### A) Treating Physician Finch

Kathy Finch, M.D., treated Plaintiff from September 2008 until at least April 2012. *See AR* at 249, 381. During her initial appointment, on September 30, 2008, Plaintiff presented to Dr. Finch with complaints of increasing neck pain and a history of Fibromyalgia. *AR* at 365. At that time, Plaintiff described her pain as "moderate." *AR* at 365. Dr. Finch confirmed Plaintiff's Fibromyalgia diagnosis, increased her dosage of hydrocodone, and started her on Lyrica. *AR* at 366.

On December 23, 2008, Plaintiff presented for a recheck of her neck pain and again described her pain as "moderate." *AR* at 364. On November 5, 2009, Dr. Finch increased Plaintiff's hydrocodone prescription for a month. *AR* at 355. On November 11, 2009, Plaintiff presented for an annual exam. She reported that the extra hydrocodone "really helps" and her dosage was permanently increased. *AR* at 352.

On March 18, 2010, Plaintiff sought FMLA paperwork from Dr. Finch's office. *AR* at 295. She reported that she was having more bad days than good and was taking a lot of time off of work. *AR* at 295. On May 27, 2011, however, Plaintiff presented for a physical and at that time reported that she felt well with "minor complaints," including a decreased energy level. *AR* at 290. On August 1, 2011, and again on September 1, 2011, Plaintiff presented with complaints of depression. *AR* at 339. Of note, Dr. Finch reported that Plaintiff was "on a good mix of meds for fibromyalgia." *AR* at 340.

Dr. Finch completed a Fibromyalgia Questionnaire on September 30, 2011 at the request of the Administration. *AR* at 247-49. Dr. Finch indicated that she had been treating Plaintiff since September 30, 2008, but that Plaintiff suffered from fibromyalgia prior to establishing treatment with her. *AR* at 249. Dr. Finch noted that Plaintiff had 12 of 18 tender points, opined that Plaintiff would be unable to sustain an 8-hour workday or 40-hour workweek and that the pain, fatigue, and other fibromyalgia symptoms would interfere with Plaintiff's ability to focus attention on work-related tasks in a competitive work environment for increments of at least 2 hours at a time. *AR* at 249. Dr. Finch indicated that Plaintiff would have variations from day-to-day in terms of her ability to function and that she would have both good and bad days. *AR* at 249. Dr. Finch indicated that Plaintiff had suffered from this degree of functional limitation even before becoming Dr. Finch's patient in 2008. *AR* at 249. Dr. Finch stated that she reached her conclusions through a combination of clinical interviews, objective clinical observations, consultation with other members of treatment staff, and objective testing. *AR* at 249.

On April 13, 2012, at Plaintiff's last appointment with Dr. Finch, she presented with symptoms of "myalgias, arthralgias, generalized fatigue, widespread pain and

morning stiffness" that had begun about six months prior. *AR* at 382. Plaintiff described her pain as "moderate" in severity and "unchanged," but was unsure whether the pain was "worsening from actual fibromyalgia or recent stress." *AR* at 382.

The ALJ addressed these visits and Dr. Finch's Fibromyalgia Questionnaire in her decision, *see AR* at 431, 433-34, and ultimately found that Dr. Finch's conclusions as to the severity of Plaintiff's impairments "reduces the credibility of her opinion, as the claimant was able to continue working full time until February 2011." *AR* at 434 (citing *AR* at 249). The ALJ also gave the "opinion little weight because treatment notes from Dr. Finch document that the claimant felt well and had a normal attention span and ability to concentrate and at another visit describe (sic) herself as having moderate pain." *AR* at 434 (citing *AR* at 290, 382).

By assigning Dr. Finch's opinions as to the functional limitations imposed by Plaintiff's fibromyalgia "little weight" the ALJ effectively rejected those opinions. *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (equating "according little weight" to an opinion with "effectively rejecting" it); *Crowder v. Colvin*, 561 F. App'x 740, 742 (10th Cir. 2014) (unpublished) (citing *Chapo* for this proposition); *Ringgold v. Colvin*, 644 F. App'x 841, 844 (10th Cir. 2016) (unpublished) (same). It was certainly the ALJ's prerogative to do so, if warranted. However, the Tenth Circuit has cautioned that "[i]f the ALJ rejects the opinion completely, [s]he must then give specific, legitimate reasons for doing so." *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003)). Moreover, "[i]n choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis

of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Id.* (quoting *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002)).

Thus, in order to ensure that an ALJ properly evaluates a treating physician's opinions "case law, the applicable regulations, and the Commissioner's pertinent Social Security Ruling (SSR) all make clear that in evaluating the medical opinions of a claimant's treating physician, the ALJ must complete a sequential two-step inquiry, each step of which is analytically distinct." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). First, the ALJ should determine whether the opinion is entitled to "controlling weight." *Watkins*, 350 F.3d at 1300. An ALJ is required to give the opinion of a treating physician controlling weight if it is both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) "consistent with other substantial evidence in the record." *Id.* (quotation omitted). "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." *Id.*

Because the ALJ does not affirmatively state whether Dr. Finch's opinions are entitled to controlling weight, it appears that the ALJ may have skipped the first step under the treating physician analysis and leapt directly to the second. In the past, this Court has held that skipping the first step in the analysis constitutes reversible error. *Wellman v. Colvin*, CIV 13-1122 KBM, Doc. 19 (D.N.M. Dec. 3, 2014). In fact, this result appeared mandatory under Tenth Circuit law. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) ("A finding at this stage (as to whether the opinion is either unsupported or inconsistent with other substantial evidence) is *necessary* so that we can properly review the ALJ's determination on appeal.") (emphasis added); *see also*

*Robinson*, 366 F.3d at 1083 (noting that the ALJ failed to expressly state whether an opinion would be afforded controlling weight); *Daniell v. Astrue*, 384 F. App'x 798, 801 (10th Cir. 2010) (unpublished) (quoting *Watkins*, 350 F.3d at 1300).

However, more recently the Tenth Circuit has indicated that where a reviewing court can determine that an ALJ "implicitly declined to give the opinion controlling weight" there is no ground for remand. *Mays v. Colvin*, 739 F.3d 569, 575 (10th Cir. 2014).[4] Here, the ALJ's decision to ascribe Dr. Finch's opinion "little weight" shows that she implicitly declined to give it controlling weight because she specifically found it the opinion to be both unsupported by her treatment notes and, more importantly, inconsistent with the fact that Plaintiff was able to work full-time from 2008 through 2011. Therefore, the Court hesitates to reverse the ALJ solely for failing to discuss explicitly whether Dr. Finch's opinion was entitled to controlling weight. *See Perez v. Colvin*, CIV 15-0429 MCA-KBM, 2016 WL 8229939, at *6 (D.N.M. Oct. 12, 2016), *report and recommendation adopted*, 2016 WL 8229937 (D.N.M. Nov. 7, 2016).

Even if a treating physician's opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527" at the second step of the

---

[4] In that decision, the Tenth Circuit panel noted that the ALJ had not "expressly" stated whether he had given the treating physician's opinion "controlling weight." Nevertheless, if it is clear that the ALJ "implicitly" declined to give such an opinion controlling weight, reversal is inappropriate. *Id.* ("Because we can tell from the decision that the ALJ declined to give controlling weight to Dr. Chorley's opinion, we will not reverse on this ground."). *See also Causey v. Barnhart*, 109 F. App'x 375, 378 (10th Cir. 2004) (unpublished) ("Implicit in the ALJ's decision is a finding that Dr. Waldrop's opinion . . . is not entitled to controlling weight."); *see also Andersen v. Astrue*, 319 F. App'x 712, 721 (10th Cir. 2009) (unpublished) ("It is apparent that the ALJ concluded that these opinions were not entitled to controlling weight. Although ordinarily the ALJ should have made explicit findings to this effect . . . we are not troubled by the substance of the ALJ's determination."

ALJ's analysis. *Watkins v*, 350 F.3d at 1300 (quoting SSR 96–2p, 1996 WL 374188, at

*4). The Tenth Circuit has summarized these factors as:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Krauser*, 638 F.3d at 1331 (quoted authority omitted). An ALJ is "not required 'to apply

expressly each of the six relevant factors in deciding what weight to give a medical

opinion.'" *Razo v. Colvin*, 663 F. App'x 710, 715 (10th Cir. 2016) (unpublished) (quoting

*Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007)). Rather, an ALJ must simply

provide "good reasons" for the weight assigned to the treating physician's opinion. *Id.*

As summarized above, the ALJ provided two reasons for rejecting Dr. Finch's

opinion – the lack of supportability in her treatment notes and that the record

established that Plaintiff did in fact work full time during the time that Dr. Finch opined

she would be unable to sustain an 8-hour workday. These two reasons touch upon the

"the degree to which the physician's opinion is supported by relevant evidence" and the

"consistency between the opinion and the record as a whole," *See* 20 C.F.R.

§ 404.1527(c)(3)-(4), and the Court finds that they satisfied the ALJ's duty to provide

"good reasons" for rejecting Dr. Finch's opinions. *See, e.g. Williams v. Barnhart*, 178 F.

App'x 785, 791 (10th Cir. 2006) (unpublished) (declining to disturb an ALJ's RFC

determination that the Plaintiff could still work as a legal secretary when she worked for

six years with permanent restrictions identified by her physician); *Cortes v. Colvin*, CIV

15-9286 EFM, 2016 WL 6563720 at *9 (D. Kan. 2016) ("the record also shows that

Cortes has been able to work contrary to Dr. Shroyer's opinion. . . . Thus, the ALJ properly assessed Dr. Shroyer's opinions under SSR 06-3p and gave good reasons for rejecting Dr. Shroyer's opinions.").

In so finding, the Court rejects Plaintiff's argument that the ALJ's "choice to reference only two (2) of Dr. Finch's treatment notes which support her decision form an incomplete basis to reject her opinion." *Doc. 21* at 16. This contention would have more force if the two treatment notes identified by the ALJ (which are located in the *AR* at 292 and 382), were not consistent with the overall course of her treatment with Dr. Finch. As noted above, Plaintiff's pain is generally described as "moderate" in her encounters with Dr. Finch, and Plaintiff has pointed to no evidence of record detracting from the ALJ's observation that "the claimant felt well and had a normal attention span and ability to concentrate[.]" *AR* at 434. Accordingly, the Court will not reverse the ALJ for rejecting the opinions of Dr. Finch.

### B) Other "Treating" Sources

While the term "medical source" refers to almost any medical provider a claimant may receive treatment from, the regulations draw a distinction between "acceptable medical sources" and those that are not. *See* SSR 06-03p, 2006 WL 2329939 at *1. Drawing this distinction is necessary, in part, because only "acceptable medical sources" can be considered treating sources as defined in 20 C.F.R. § 404.1502, whose medical opinions may be entitled to controlling weight. *Id.* at *2.

Still, "[i]t is the ALJ's duty to give consideration to all the medical opinions in the record." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citing 20 C.F.R. §§ 404.1527(c), 416.927(c)). "[Sh]e must also discuss the weight [s]he assigns

to such opinions." *Id.* (citing 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii)). While not entitled to the same deference as an "acceptable medical source," opinions from other medical sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03P, 2006 WL 2329939 at *3.

Factors to be considered by an ALJ when evaluating an opinion from a provider that does not qualify as an "acceptable medical source" include:

• How long the source has known and how frequently the source has seen the individual;

• How consistent the opinion is with other evidence;

• The degree to which the source presents relevant evidence to support an opinion;

• How well the source explains the opinion;

• Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

• Any other factors that tend to support or refute the opinion.

*Id.* at *4-5. "Not every factor for weighing opinion evidence will apply in every case[,]" but, rather, "[t]he evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case." *Id.* at *5. "In the case of a nonacceptable medical source, the ALJ's decision is sufficient if it permits us to follow the adjudicator's reasoning." *Fulton v. Colvin*, 631 F. App'x 498, 503–04 (10th Cir. 2015) (unpublished) (quoting *Keyes–Zachary*, 695 F.3d at 1164) (internal alterations omitted).

### 1. Physician's Assistant Stockdale[5]

Nancy Stockdale, a Certified P.A., worked for Dr. Finch, *see, e.g.*, *AR* at 295-97, and she completed Family Medical Leave Act (FMLA) forms for Plaintiff in April 2009 and March 2010. *Id.* Ms. Stockdale indicated on the April 14, 2009 forms that Plaintiff experiences extreme pain and fatigue on some days and could be expected to miss 2-3 days of work per month due to her symptoms. *AR* at 781-82. She further opined that "pain prevents full functioning at work – concentration affected by pain." *AR* at 782. A year later, Ms. Stockdale opined that Plaintiff's symptoms could be expected to cause her to miss 2-6 days of work per month due to unpredictable and severe symptoms. *See AR* at 770-71.

The ALJ gave little weight to Ms. Stockdale's opinions "because the claimant continued to be able to maintain her job until February, 2011." *AR* at 431. The ALJ went on to state that "[r]equiring FMLA does not necessarily mean that an individual is unable to work." *AR* at 431. The ALJ also noted that a physician's assistant is not an acceptable medical source, and that "[t]reatment notes from March 2010 report that claimant was incapacitated once every three weeks due to her fibromyalgia. This alone would not preclude employment." *AR* at 431 (citing *AR* at 295).

Plaintiff argues that these reasons are "neither adequate nor legitimate," *Doc. 21* at 18, but the Court is inclined to disagree. As required by SSR 06-03P, the ALJ considered whether Ms. Stockdale's opinion was consistent with other evidence in the record – that is, Plaintiff's ability to continue working full-time despite her symptoms.

---

[5] While Plaintiff's opening brief identifies this provider as Nancy Stockton, PA-C, and faults the ALJ for being unable to identify her by name, the Commissioner correctly points out that the PA-C's last name is actually Stockdale, not Stockton. *Compare Doc. 21* at 17 *with Doc. 25* at 17 *and AR* at 297.

*See* SSR 06-03P, 2006 WL 2329939 at \*4-5. The ALJ also considered Ms. Stockdale's level of expertise and contrasted her opinions as stated in the FMLA forms with contemporaneous evidence of record. *AR* at 295 (indicating that Fibromyalgia incapacitates Plaintiff once every 2-3 weeks). While the ALJ's analysis could have been more precise and could have employed more of the factors stated in SSR 06-03P, the Court will not reverse her for her treatment of Ms. Stockdale's opinions.

### 2. Certified Nurse Practitioner Jaccard

Debra Jaccard, CNP, treated Plaintiff for anxiety and depression from 2013 through 2015. During the course of her treatment of Plaintiff, Ms. Jaccard completed two Medical Assessment of Ability to do Work-Related Activities (Mental) forms, which the ALJ discussed and weighed. *See AR* at 434. As to these opinions, the ALJ noted internal inconsistencies and "more limiting symptoms in 2013." *AR* at 434. The ALJ surmised that these differences suggested "an improvement in the claimant's symptoms or imprecise completion of the forms." *AR* at 434. The ALJ also noted that Plaintiff never alleged any difficulties getting along with others, and determined that Ms. Jaccard's opinions were entitled only to "little weight"

> because she is not an examining and treating source and also because she consistently assigned GAF[6] scores of 60 and up to 70. These scores are inconsistent with any marked limitations. Further, the claimant reported improved symptoms with her medications. This improvement is also not reflected in these statements.

---

[6] "GAF" stands for "Global Assessment of Functioning." As the Tenth Circuit has noted, "[t]he GAF is a subjective rating on a scale of 1 to 100 of 'the clinician's judgment of the individual's overall level of functioning.'" *Holcomb v. Astrue*, 389 F. App'x 757, 759 n.1 (10th Cir. 2010) (quoting American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 32). Although the current Diagnostic and Statistical Manual has abandoned the use of GAF scores, *see* Am. Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders (DSM-V) at 16 (5th ed. 2013), they continue to be used in psychiatric practice, as evidenced by this case.

*AR* at 434. The Court finds that most of the ALJ's reasons for discounting Ms. Jaccard's opinions are supported by substantial evidence, and so will not reverse the ALJ for effectively rejecting them.

On April 26, 2013, Plaintiff presented to Ms. Jaccard reporting that she continued to struggle with anxiety and depression, chronic pain, and sleep issues. *AR* at 855. On May 15, 2013, Plaintiff told Ms. Jaccard that "things aren't going much better. My husband still hasn't sent any money home and things are really tight." *AR* at 855. Ms. Jaccard noted low energy and a depressed mood, and assigned a GAF score of 60. *AR* at 855. On June 6, 2013, Plaintiff reported that she was feeling a little calmer but was still "really depressed" and had no motivation. *AR* at 851. She also reported that her family still had financial issues. *AR* at 852. Ms. Jaccard noted low energy and a depressed affect and assigned a GAF score of 60. *AR* at 852.

On June 7, 2013, Ms. Jaccard filled out a Medical Assessment of Ability to do Work-Related Activities (mental) form in conjunction with Plaintiff's disability claim. *AR* at 859-860. On that form Ms. Jaccard indicated that Plaintiff had moderate to marked limitations in all areas of sustained concentration and persistence, moderate to marked limitations in all but one area of social interaction, and moderate limitations in all areas of adaptation. *AR* at 859-860. Ms. Jaccard summarized her findings by stating that Plaintiff has severe anxiety, which impacts her ability to cope, focus and concentrate and to be able to manage a normal workload. *AR* at 860. Ms. Jaccard also opined that Plaintiff met the agency's listing for affective disorders. *AR* at 861-62.

On September 11, 2014, Plaintiff told Ms. Jaccard "I am still waiting to hear about my disability and I still am struggling with depression and anxiety." *AR* at 710. At that

time Ms. Jaccard noted that Plaintiff's mood was anxious and mildly to moderately depressed and she assigned a GAF score of 60. *AR* at 710.

On November 13, 2014, Ms. Jaccard noted that Plaintiff was denied disability for the second time and was feeling "more depressed and 'blah.'" *AR* at 711. Ms. Jaccard adjusted Plaintiff's medications and assigned a GAF score of 60. *AR* at 711. On January 15, 2015, Plaintiff stated that she was "doing about the same." *AR* at 712. She reported that she still had not heard anything about her disability claim and so was getting "pretty frustrated about it." *AR* at 712. Ms. Jaccard assigned a GAF score of 60 and continued Plaintiff's medications. *AR* at 712.

On June 16, 2015, Plaintiff reported to Ms. Jaccard that she was working two days a week and taking care of her preschool-age granddaughter two days a week. *AR* at 655. At that time Ms. Jaccard indicated that Plaintiff's response to treatment was "good" and she assigned a GAF score of 65. *AR* at 655. On August 14, 2015, Plaintiff reported that she was still working part time and waiting to hear about her disability claim. *AR* at 679. Despite noting that Plaintiff's report that her depression was made worse by her new diabetes medication, Ms. Jaccard indicated that Plaintiff's response to treatment was "fair" and she assigned a GAF score of 70. *AR* at 679.

On October 21, 2015, Ms. Jaccard completed a second Medical Assessment of Ability to do Work-Related Activities (Mental) form for Plaintiff. *AR* at 791. On this form Ms. Jaccard opined that Plaintiff was markedly limited in the ability to complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *AR* at 791. Ms. Jaccard also noted moderate limitations in various aspects of

understanding and memory, sustained concentration and persistence, social interaction and adaptation. *AR* at 791-92. Ms. Jaccard went on to opine that Plaintiff meets the listing for Affective and Anxiety-Related Disorders. *AR* at 793.

Given their longitudinal treatment relationship, Plaintiff correctly takes issue with the ALJ's statement that Ms. Jaccard was "not an examining and treating source."[7] Still, it appears that the ALJ's other reasons are in accord with the factors stated in SSR 06-03p, and the Court can follow the ALJ's reasoning.

For instance, the ALJ addressed the degree to which Ms. Jaccard's treatment notes supported her opinions (pointing out "internal inconsistencies"). In this regard, the ALJ specifically referenced Ms. Jaccard's 2013 finding that Plaintiff would be markedly impaired in social functioning and contrasted it with her 2015 finding that Plaintiff would have no such restriction. *AR* at 434. As the ALJ permissibly opined, this difference signals either an improvement in Plaintiff's functioning over the course of two years, or "imprecise completion of the forms." *AR* at 434. While the Court agrees with Plaintiff that "it is reasonable to believe that Ms. O'Mary showed reduction in some symptoms over a period of two years," *Doc. 21* at 19, Ms. Jaccard's treatment notes do not reflect such a dramatic improvement.

Plaintiff also maintains that the ALJ should not have relied upon Plaintiff's GAF scores to discount the marked limitations identified by Ms. Jaccard. *See Doc. 21* at 19 ("as the Commissioner often reminds claimants, the GAF assessment is a snapshot of what a health professional estimates a claimant's functioning to be." (quoting *Groberg v. Astrue*, 505 F. App'x 763, 771 (10th Cir. 2012) (unpublished), for the proposition that "a

---

[7]   As the Commissioner points out, however, even treating nurses and physician assistants are not acceptable medical sources capable of giving medical opinion. *Doc. 25* at 17.

single 'good day' at the doctor's office does not necessarily signify a lack of any occupational effects from mental disorders.")). Plaintiff's argument would have more force if she did not consistently have GAF scores which ranged from 60-70, indicating moderate symptoms, at worst, and mild symptoms, at best. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) at 32.[8] Moreover, Plaintiff's testimony that she has seen improvement with her mental health medications, *AR* at 475, buttresses consideration of the GAF scores. It was therefore reasonable for the ALJ to discount Ms. Jaccard's opinions based on the GAF scores she regularly assigned.

Plaintiff does not address the ALJ's other reasons for discounting Ms. Jaccard's opinions, and the Court finds no fault in them. For instance, it was appropriate for the ALJ to contrast the absence of any alleged difficulty in getting along with others to Ms. Jaccard's limitation of Plaintiff's abilities as to social functioning. *Compare AR* at 473 (testimony) *with* 792 (second Medical Assessment).

**Certified Family Nurse Practitioner Romero**

Plaintiff presented to Marissa Romero, CFNP, on October 4, 2010, complaining of chronic, worsening, fatigue, and headaches, but not of a severity as to limit her activities. *AR* at 727. Ms. Romero diagnosed myalgia and myositis unspecified, but declined to prescribe medication absent documentation of a formal diagnosis of fibromyalgia. *AR* at 728-29. Ms. Romero continued to treat Plaintiff over the following

---

[8] According to the DSM IV, a GAF score ranging from 51-60 indicates "[m]oderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)[,]" while a score ranging from 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

years and completed Medical Assessment of Ability to do Work-Related Activities (physical) forms in conjunction with Plaintiff's disability claim on May 23, 2013 and October 8, 2015. *AR* at 857, 795.

On May 23, 2013, Ms. Romero opined that Plaintiff's conditions limit her to lifting less than 10 pounds occasionally and 5 pounds frequently. *AR* art 857. Ms. Romero further opined that Plaintiff could stand and/or walk less than 2 hours in an 8-hour workday and sit less than 4 hours in an 8-hour workday. *AR* at 857. Ms. Romero also completed a Medical Assessment of Ability to do Work-Related Activities (non-physical) form for Plaintiff, noting that Plaintiff's severe pain would cause moderate to marked limitations in all but one area of mental functioning. *AR* at 858.

Two years later, on October 8, 2015, Ms. Romero opined that Plaintiff's conditions limit her to lifting less than five pounds, standing and walking less than 2 hours in an 8-hour workday, and sitting less than 6 hours in an 8-hour work day. *AR* at 795. Ms. Romero also completed a Medical Assessment of Ability to do Work-Related Activities (non-physical) form for Plaintiff's application. *AR* at 796. On this form, Ms. Romero opined that Plaintiff was moderately impaired in all areas of functioning with the exception of maintaining physical effort for long periods without a need to decrease activity or pace, which Ms. Romero opined that Plaintiff was markedly impaired. *AR* at 796.

The ALJ gave Ms. Romero's opinions "little weight" because her treatment notes were "very duplicative and imprecise and provided little insight into the changes in the claimant's functioning." *AR* at 434. The ALJ also noted that Ms. Romero "is not an acceptable medical source and her treatment of the claimant was conservative. The

claimant continued to be able to ambulate without an assistive device and never mentioned any limitations with respect to lifting[.]" *AR* at 435.

Plaintiff admits that Ms. Romero's treatment notes are duplicative, *Doc. 21* at 21, but she argues that the restrictions Ms. Romero identified are nonetheless consistent with those proscribed by Ms. Jaccard and consultative examiner Vigil. *Id.* at 21-22. Plaintiff argues that had the ALJ accepted Nurse Practitioner Romero's limitations then a more restrictive RFC would have resulted. *Doc. 21* at 22. While this may be true, the ALJ's reasons for discounting the opinions are supported by substantial evidence and the Court can follow the ALJ's reasoning. Therefore, the Court will not reverse the ALJ for her treatment of Ms. Romero's opinions.

To say that Ms. Romero's treatment notes are "duplicative" and "imprecise" is an understatement. Records from 2014 through 2015 are almost identical and are in some places internally inconsistent.[9] The Court therefore agrees that these records "provided little insight into the changes in the claimant's functioning" over the course of her treatment with Ms. Romero, and provide little support for the medical assessments she submitted in aid of Plaintiff's disability application. Moreover, the ALJ acceptably discounted the opinion on the basis that Ms. Romero is not an acceptable medical

---

[9] For example, on December 11, 2014, Plaintiff presented with chronic pain. According to the records, Plaintiff rated her pain as 7/10 and described it as originating in her neck and back, and legs. *AR* at 815. Ms. Romero noted a full range of motion in Plaintiff's head and neck and a normal gait. *AR* at 815. These records appear to have been duplicated for Plaintiff's follow-up appointments on April 7, 2015, *AR* at 813, and May 7, 2015. *AR* at 811. Likewise, on June 25, 2015, Plaintiff presented to Ms. Romero complaining of worsening foot pain "occurring in a persistent pattern for 6 months (+)." *AR* at 805. Gait was noted as both "slow and cautious" and "normal." *AR* at 805-06. These treatments notes appear to have been duplicated for Plaintiff's following visits with Ms. Romero, on July 23, 2015, *AR* at 803-04, August 20, 2015, *AR* at 801-02, and September 17, 2015, *AR* at 799-800.

source, that her treatment of Plaintiff was conservative, and that there was no support in the record for Ms. Romero's opinions as to Plaintiff's ability to ambulate and lift.

### C) Consultative Examiner Vigil

John Vigil, M.D., examined Plaintiff at her attorney's request on June 28, 2013. *AR* at 842. Dr. Vigil also reviewed records from Dr. Finch's office. *AR* at 843. At the time of her evaluation Plaintiff rated her pain as an 8/10. *AR* at 845. Dr. Vigil observed that she walked into the examination room with "a slow, stiff, and antalgic gait." *AR* at 845. Dr. Vigil also noted a decreased range of motion in Plaintiff's back but a normal range of motion in Plaintiff's knees. *AR* at 845. Dr. Vigil diagnosed Plaintiff with chronic pain, arthritis, fibromyalgia, and depression/anxiety. *AR* at 846. He opined that Plaintiff "is totally and completely disabled secondary to her chronic pain and co-morbid psychiatric conditions." *AR* at 846. However, Dr. Vigil went on to state that "[i]t is my opinion that Ms. Griego's (sic) disabilities, including her chronic pain preclude her from performing work above a sedentary level on a full-time and sustained basis from at least 2011." *AR* at 846. Dr. Vigil completed a Medical Assessment of Ability to do Work-Related Activities (non-physical) form, noting that Plaintiff would have several marked limitations in her abilities to perform non-physical work activities. *AR* at 848. Dr. Vigil also completed a Medical Assessment of Ability to do Work-Related Activities (physical) form, opining that Plaintiff could lift no more than five pounds, could stand and walk less than 2 hours in an 8-hour workday, and sit less than 4 hours in an 8-hour workday. *AR* at 849.

The ALJ gave Dr. Vigil's opinion "no weight" for several reasons. *See AR* at 435. The first two, that "he was hired by the claimant's representative and is not a treating

doctor," have been specifically *rejected* by the Tenth Circuit as legitimate reasons for

rejecting an opinion. *See Quintero v.* Colvin, 642 F. App'x 793, 797 (10th Cir. 2016)

(unpublished) ("More than 13 years ago, this court held in *McGoffin* that a physician's

advocacy posture is an insufficient reason to reject a medical opinion."); *Crowder v.*

*Colvin*, 561 F. App'x 740, 743 (10th Cir. 2014) (unpublished) (rejecting the reasoning

that a medical opinion is "less trustworthy when it is sought or obtained by the claimant"

and stating that "[a]lthough the lack of a treating relationship is relevant to the weight to

be afforded an opinion, it is not grounds for simply rejecting an opinion."); *Chapo v.*

*Astrue*, 682 F.3d 1285 (10th Cir. 2012) ("The Commissioner has not cited a single

authority for the facially dubious proposition that the opinion of an examining medical

source is, *as such*, dismissible."). The Commissioner effectively concedes this point.

The Commissioner argues that this Court should nonetheless "affirm because the

ALJ gave *other* valid reasons for discounting Dr. Vigil's opinion." *Doc. 25* at 16

(emphasis added). The Court agrees.

Dr. Vigil's findings are considered an "examining medical-source opinion."

*Ringgold*, 644 F. App'x at 843 (citing *Chapo*, 682 F.3d at 1291; 20 C.F.R.

§§ 404.1527(c)(1), 416.927(c)(1)). "An examining medical-source opinion 'may be

dismissed or discounted, of course, but that must be based on an evaluation of all of the

factors set out in the . . . regulations and the ALJ must provide specific, legitimate

reasons for rejecting it.'" *Id.* The relevant factors include:

> (1) the length of the treatment relationship and the frequency of
> examination; (2) the nature and extent of the treatment relationship,
> including the treatment provided and the kind of examination or testing
> performed; (3) the degree to which the physician's opinion is supported by
> relevant evidence; (4) consistency between the opinion and the record as
> a whole; (5) whether or not the physician is a specialist in the area upon

which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir.2003); *Chapo*, 682 F.3d at 1291; 20 C.F.R. §§ 404.1527(c), 416.927(c)). "The ALJ is not required to mechanically apply all of these factors in a given case. . . . [i]t is sufficient if [s]he 'provide[s] good reasons in [her] decision for the weight [s]he gave to the [physician's] opinions.'" *Id.* (quoting *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007)).

Here, setting aside the impermissible reasons cited by the ALJ, she rejected Dr. Vigil's opinion because "[h]e only saw her on one occasion and although he reported that her gait was slow and antalgic, other treatment notes from 2013 noted a normal gait." *AR* at 435 (citing administrative exhibits 11F/8, 12F/5, 14F/14, 18). These two reasons touch upon the treatment relationship (or lack thereof) between Plaintiff and Dr. Vigil, and the consistency between the opinion and the record as a whole. To be sure, the ALJ's observation that no contemporaneous treatment notes describe Plaintiff's gait as anything other than normal is supported by the record. *See AR* at 390, 400, 403, 414, 576, 581, 585, 724, 852, 855. Accordingly, while the Court would have obviously preferred that the ALJ supported her rationale with additional regulatory factors, it will not disturb her decision to reject Dr. Vigil's opinion for the reasons stated.

**D)  The ALJ's Step Five Findings**

Plaintiff's finally contends that the ALJ's Step Five findings are not supported by substantial evidence because the VE's testimony regarding the number of jobs in the national economy is "not reliable." *Doc. 21* at 24. As noted above, the VE in this case testified that given Plaintiff's age, education, work experience, and RFC, she is able to perform occupations such as Electronics Worker, Dictionary of Occupational Titles

("DOT") No. 726.687-010 (200,000 jobs available nationally), Press Operator, DOT No. 363.684-018 (50,000 jobs available nationally), and Fruit Distributer, DOT No. 921.685-046 (39,000 jobs available nationally). *AR* at 436. Plaintiff argues that the VE's numbers for both the electronics worker and fruit distributor jobs are unsupported because "[t]he Department of Labor's Occupational Outlook Handbook provides the number of positions available in the national economy for broad categories of jobs, but not for individual DOT listings like those to which VE Griner (sic) testified." *Doc. 21* at 25.

It is true that "[t]he number of available jobs in a particular category is not included within the DOT." *Rivera v. Berryhill*, CIV 16-0048 RB/KBM, 2017 WL 1906961, at *11 (D.N.M. Mar. 16, 2017). "Consequently, the ALJ must either look to other reliable sources that provide the numbers of jobs available in the national economy for a particular DOT number, or the ALJ must obtain the testimony of a vocational expert to provide that evidence." *Therrell v. Berryhill*, CIV 15-0782 LF, 2017 WL 1437316, at *6 (D.N.M. Apr. 21, 2017). "The whole point of vocational testimony is to go beyond facts already established through publications eligible for judicial or administrative notice and provide an alternative avenue of proof." *Rogers v. Astrue*, 312 F. App'x 138, 142 (10th Cir. 2009) (unpublished).

The Tenth Circuit has always been highly deferential towards VE testimony, and has "accepted without reservation VE testimony concerning the number, percentage and location of jobs within a claimant's capacity." *Rivera*, 2017 WL 1906961, at *11 (citing *Trimiar v. Sullivan*, 966 F.2d 1326, 1331 (10th Cir. 1992)); *see also Rogers v. Astrue*, 312 F. App'x 138, 141 (10th Cir. 2009) (affirming a Step-Five finding as to the

availability and number of jobs which relied upon a VE's "professional placement experience."). For this reason alone, the Court could affirm.

Plaintiff's arguments are based entirely on speculation as to what sources the VE *may have* employed in this case.[10] Yet, following Plaintiff's logic and citations to various internet sources fails to adduce numbers which match those provided by the VE, and Plaintiff has not identified a "reliable" source of job data for the individual DOT jobs identified by the VE in this case. While Plaintiff argues this is the agency's burden, the fact remains that Plaintiff's counsel was present at the hearing when the VE testified and, though provided with the opportunity to question the VE as to the source of the number of jobs provided, declined to do so. *See AR* at 487-88. The Court will not reward Plaintiff for passively accepting the VE's conclusions at the hearing only to now speculate that his premises were unreliable.

## IV. Conclusion

Plaintiff has failed to demonstrate that the ALJ committed harmful, reversible, error in this case.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Remand (*Doc. 21*) is **denied**.

**IT IS FURTHER ORDERED** that a Final Order pursuant to Rule 58 of the Federal

---

[10] Plaintiff speculates that the VE relied upon OES group numbers from the Bureau of Labor Statistics. *See Doc. 21* at 24-25. "The Occupational Employment Statistics ('OES') Survey is a federal-state cooperative program between the U.S. Department of Labor's Bureau of Labor Statistics and state workforce agencies that provides national occupational employment and wage rate estimates. *Therrell*, 2017 WL 1437316, at *6 (citations omitted). "Job data in the OES naturally varies from the DOT, as the OES classifies jobs by census codes, known as Standard Occupational Classification ("SOC") codes, rather than DOT codes." *Id.* Still, "Courts in this district have found that the OES is a reliable source for the basis of VE testimony, and OES groupings are routinely used throughout the Tenth Circuit to support step five findings." *Id.*

Rules of Civil Procedure be entered affirming the decision of the Acting Commissioner

and dismissing this action with prejudice.

_____

UNITED STATES CHIEF MAGISTRATE JUDGE
Presiding by Consent